Filed 11/26/13  P.v. Olsen CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039298 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 201555) |
| v. | |
| WILLIAM KARL OLSEN, | |
| Defendant and Appellant. | |

## I.  INTRODUCTION

Defendant William Karl Olsen was committed for an indeterminate term to the California Department of Mental Health (now, State Department of State Hospitals; hereafter the Department) after a jury determined him to be a sexually violent predator (SVP) within the meaning of the Sexually Violent Predator Act (SVPA).  (Welf. & Inst. Code, § 6600 et seq.)[1]  Defendant appealed from the judgment, contending that the indeterminate term of commitment violated equal protection, due process, and the ex post facto and double jeopardy clauses.  This court reversed the judgment and remanded the matter to the trial court for the limited purpose of reconsidering defendant's equal protection argument in light of *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*) and

---

[1] All further statutory references are to the Welfare and Institutions Code unless stated otherwise.

the resolution of the proceedings on remand in that case. (*People v. Olsen* (September 11, 2012, H036654) [nonpub. opn.] (*Olsen*).) This court also ordered that the trial court suspend further proceedings in defendant's case pending finality of the proceedings on remand in *McKee I*.

After further trial court proceedings were held on remand in *McKee I*, the defendant appealed and the appellate court issued an opinion determining that substantial evidence supported the trial court's finding that disparate treatment of SVP's is warranted. (*People v. McKee* (2012) 207 Cal.App.4th 1325, 1330-1331 (*McKee II*).) On January 25, 2013, after the California Supreme Court denied review of *McKee II*, the trial court in the instant case again ordered defendant committed to the Department for an indeterminate term under the SVPA.

In the present appeal, defendant contends that (1) this court should not follow *McKee II* because his challenge to the imposition of an indeterminate term under the SVPA should have been resolved on an "as applied" basis, and (2) a commitment for an indeterminate term under the SVPA violates equal protection clauses of the federal and state Constitutions. We will affirm the judgment.

## II. LEGAL BACKGROUND

### A. Brief Overview of the SVPA

The SVPA provides for the involuntary civil commitment, for treatment and confinement, of an individual who is found by a unanimous jury verdict (§ 6603, subds. (e), (f)), and beyond a reasonable doubt (§ 6604), to be a "sexually violent predator" (*ibid.*). The definition of an SVP is set forth in section 6600, subdivision (a)(1) as follows: " 'Sexually violent predator' means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."

2

The SVPA was amended twice in 2006. Prior to those amendments, an individual determined to be an SVP was committed to the custody of the Department for a two-year term. The individual's term of commitment could be extended for additional two-year periods. (Former § 6604, as amended by Stats. 2000, ch. 420, § 3; former § 6604.1, as amended by Stats. 2000, ch. 420, § 4.)

On September 20, 2006, the Governor signed into law Senate Bill No. 1128, which amended the SVPA effective immediately. (Stats. 2006, ch. 337, § 62.) Among other changes, the amended SVPA provided for an indeterminate term of commitment, and the references to two-year commitment terms and extended commitments in sections 6604 and 6604.1 were eliminated. (Stats. 2006, ch. 337, §§ 55, 56.)

Less than two months later, voters approved Proposition 83, which amended the SVPA effective November 8, 2006. (See Cal. Const., art. II, § 10, subd. (a).) Like Senate Bill No. 1128, Proposition 83 amended the SVPA to provide that an SVP'S commitment term is "indeterminate." (§ 6604; see § 6604.1.) Proposition 83 also eliminated all references to a two-year term of commitment and most references to an extended commitment in sections 6604 and 6604.1. Thus, a person found to be an SVP under the SVPA is now subject to an indeterminate term of involuntary civil commitment. (*People v. Whaley* (2008) 160 Cal.App.4th 779, 785-787.)

### B. McKee I

In *McKee I*, the defendant argued that his indeterminate commitment under the SVPA violated his equal protection rights because the SVPA treats SVP's significantly less favorably than similarly situated individuals who are civilly committed under other statutes. (*McKee I*, *supra*, 47 Cal.4th at p. 1196.) The California Supreme Court determined that SVP's and mentally disordered offenders (MDO's; Pen. Code, § 2960 et seq.) are similarly situated for equal protection purposes because they have been involuntarily committed with the objectives of treatment and protection of the public. (*Id.* at p. 1203.) The court also determined that SVP's have "different and less favorable

3

procedural protections" than MDO's because "SVP's under the amended [SVPA] are given indeterminate commitments and thereafter have the burden to prove they should be released (unless the [Department] authorizes a petition for release). In contrast, an MDO is committed for a one-year period and thereafter has the right to be released unless the People prove beyond a reasonable doubt that he or she should be recommitted for another year." (*Id*. at p. 1202.) The court rejected the appellate court's finding that "the legislative findings recited in the [Proposition 83] ballot initiative" were sufficient to justify the disparate treatment of SVP's and MDO's. (*Id*. at p. 1207.)

The California Supreme Court found that SVP's and persons not guilty of a felony by reason of insanity (NGI's; Pen. Code, § 1026.5) are also similarly situated and "a comparison of the two commitment regimes raises similar equal protection problems . . . ." (*McKee I, supra*, 47 Cal.4th at p. 1207.) Consequently, the court agreed with the defendant "that, as with MDO's, the People have not yet carried their burden of justifying the differences between the SVP and NGI commitment statutes." (*Ibid*.)

However, in *McKee I*, the California Supreme Court did "not conclude that the People could not meet [their] burden of showing the differential treatment of SVP's is justified." (*McKee I, supra*, 47 Cal.4th at p. 1207.) The court gave the People "an opportunity to make the appropriate showing on remand," noting that the People would have to show that "notwithstanding the similarities between SVP's and MDO's, the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society." (*Id*. at p. 1208.)

The *McKee I* court then remanded the case with the following instructions: "We therefore remand this case to the trial court to determine whether the People, applying the equal protection principles articulated in [*In re Moye* (1978) 22 Cal.3d 457 (*Moye*)] and related cases discussed in the present opinion, can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and

4

NGI's in order to obtain release from commitment. The trial court may, if appropriate, permit expert testimony. [¶] . . . On remand, the government will have an opportunity to justify Proposition 83's indefinite commitment provisions, at least as applied to McKee, and demonstrate that they are based on a reasonable perception of the unique dangers that SVP's pose rather than a special stigma that SVP's may bear in the eyes of California's electorate. [¶] Moreover, we emphasize that mere disagreement among experts will not suffice to overturn the Proposition 83 amendments. The trial court must determine whether the legislative distinctions in classes of persons subject to civil commitment are reasonable and factually based—not whether they are incontrovertible or uncontroversial. The trial court is to determine not whether the statute is wise, but whether it is constitutional." (*McKee I*, *supra*, 47 Cal.4th at pp. 1208-1211, fns. omitted.)

### C. *McKee II*

On remand in *McKee I,* "the trial court conducted an evidentiary hearing to determine whether the People could justify the [SVPA's] disparate treatment of SVP's under the strict scrutiny standard for equal protection claims. At the hearing, the People presented the testimony of eight witnesses and documentary evidence. The trial court also allowed McKee to present evidence; he presented the testimony of 11 witnesses and documentary evidence. The court issued a 35-page statement of decision summarizing the extensive testimonial and documentary evidence presented at the hearing and finding the People had met their burden to establish, by a preponderance of the evidence, that the disparate treatment of SVP's under the [SVPA] was based on a reasonable perception of the greater and unique dangers they pose compared to MDO's and NGI's." (*McKee II, supra,* 207 Cal.App.4th at p. 1332.)

McKee appealed, and Division One of the Fourth Appellate District affirmed the trial court's order. (*McKee II, supra,* 207 Cal.App.4th at pp. 1330-1331, 1350.) In *McKee II*, the appellate court explained that it would "independently determine whether the People presented substantial, factual evidence to support a reasonable perception that

5

SVP's pose a unique and/or greater danger to society than do MDO's and NGI's, thereby justifying the disparate treatment of SVP's under the [SVPA]." (*Id.* at p. 1338.)

After performing its independent review of the evidence presented in the 21-day evidentiary hearing held in the trial court (*McKee II, supra,* 207 Cal.App.4th at p. 1330), the *McKee II* court made several findings. First, with respect to recidivism, the court determined that the expert witness testimony of three psychologists, as well several studies and the Static-99 data comparing recidivism rates, was sufficient to show that "the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely than recidivism of sex offenders generally, but does not show SVP's have, in fact, a higher sexual recidivism rate than MDO's and NGI's. . . . Regardless of the shortcomings or inadequacy of the evidence on actual sexual recidivism rates, the Static-99 evidence . . . supports, by itself, a reasonable inference or perception that SVP's pose a higher *risk* of sexual reoffending than do MDO's or NGI's." (*Id.* at p. 1342.)

The Static-99 evidence included in the Department's data showed that the average Static-99 score for all SVP's civilly committed since 2006 was 6.19, which placed them in the " 'high' risk category for sexual reoffense." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1341.) In contrast, the average Static-99 score for MDO's at Patton State Hospital subject to sex offender registration under Penal Code section 290 in 2010 was 3.6, "placing them in the 'moderate-low' risk category for sexual reoffense." (*Ibid*.) The average Static-99 score for all patients discharged from Atascadero State Hospital since January 1, 2010, and subject to sex offender registration, including MDO's and NGI's, was 4.6, which placed them in the " 'moderate-high' risk category for sexual reoffense." (*Id*. at pp. 1341-1342.)

Second, the *McKee II* court considered whether the People had "presented evidence that the victims of sex offenses suffer unique and, in general, greater trauma than victims of nonsex offenses." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1342.) Based on the expert witness testimony, the court concluded that "there is substantial evidence to

6

support a reasonable perception by the electorate, as a legislative body, that the harm caused by child sexual abuse and adult sexual assault is, in general, a greater harm than the harm caused by other offenses and is therefore deserving of more protection." (*Id.* at pp. 1343-1344.)

Third, the *McKee II* court found that there was "substantial evidence to support a reasonable perception by the electorate that SVP's have significantly different diagnoses from those of MDO's and NGI's,[2] and that their respective treatment plans, compliance, and success rates are likewise significantly different. That evidence and the evidence on recidivism . . . , as the trial court found, 'supports the conclusion that, as a class, SVP's are clinically distinct from MDO's and NGI's and that those distinctions make SVP's more difficult to treat and more likely to commit additional sexual offenses than are MDO's and NGI's.' In particular, SVP's are less likely to participate in treatment, less likely to acknowledge there is anything wrong with them, and more likely to be deceptive and manipulative. . . . Furthermore, there is substantial evidence to support a reasonable inference that an indeterminate, rather than a determinate (e.g., two-year), term of civil commitment supports, rather than detracts from, the treatment plans for SVP's." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1347.)

The appellate court therefore concluded in *McKee II* that "the People on remand met their burden to present substantial evidence, including medical and scientific evidence, justifying the amended [SVPA's] disparate treatment of SVP's (e.g., by imposing indeterminate terms of civil commitment and placing on them the burden to prove they should be released). [Citation.]" (*McKee II*, *supra*, 207 Cal.App.4th at

_____

[2] Dr. David Fennell, a psychiatrist and the chief of forensics at Atascadero State Hospital, testified that "MDO's and NGI's with a sexual predicate offense were not more likely to commit a new sexual offense (versus another dangerous offense) on release because their mental disorders made them disorganized and unpredictable. In comparison, SVP's are more likely to commit a new sexual offense because of their diagnoses with pedophilia or other paraphilias." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1345.)

7

p. 1347.) Accordingly, the trial court's order rejecting the defendant's equal protection claim and affirming his indeterminate commitment under the SVPA was upheld. (*Id*. at p. 1350.) The California Supreme Court denied review of *McKee II* on October 10, 2012, and therefore the proceedings on remand in *McKee I* are now final.

### III.    FACTUAL AND PROCEDURAL BACKGROUND

By order of July 18, 2013, this court has taken judicial notice of defendant's prior appeal in *Olsen*, *supra*, H036654. A summary of the factual and procedural background that we have taken from the prior opinion is provided as follows:

"In 1972, Olsen used a handgun to abduct a 27-year-old woman in her car. After a struggle, Olsen got out of the car and left. There was no indication that a sexual offense had occurred and Olsen was convicted of 'grand theft of a person.' He served a jail sentence and was placed on probation.

"The next incident took place in July 1973, when Olsen picked up two teenage girls, M. and T., who were hitchhiking. After taking the girls to an isolated area where his truck got stuck in the dirt, Olsen had them stand on the truck bed to gain traction. He then pushed T. down a 75-foot ravine and hogtied M. After finding T. and threatening her with a knife, Olsen saw that T. was bleeding profusely. He untied M. and together they brought T. back up to the truck. When the girls asked Olsen why he was doing this, he said he intended to rape them. Olsen did not rape the girls and instead took them home.

"In August 1973, Olsen picked up a[] 19-year-old hitchhiker, M.L., and took her to an isolated area. When Olsen took out a rope, M.L. pleaded with him not to tie her up. Olsen then ripped off M.L.'s blouse and M.L. said she would do what he wanted her to do. After placing M.L. on the truck bed and raping her, Olsen apologized. M.L. asked him to take her to the hospital because she recently had surgery following a miscarriage. Olsen took M.L. to the hospital and checked himself into the psychiatric unit next door.

8

"Olsen was incarcerated in 1974 and paroled in 1978. He was discharged from parole in 1979 and committed his next sexual offenses in 1980. C., a 16-year-old girl, was picked up by Olsen in January 1980 while she was hitchhiking and taken to Stevens Creek Dam. After arriving, Olsen, who had knife, hit C. below the eye and tied her up with rope. Olsen then took C. to another location in the mountains. There, Olsen put a rope around C.'s neck and walked her up a trail to a desolate location, where he orally copulated C., sat on her, untied her, and forced her to orally copulate him. Olsen also sodomized C. and raped her. He then apologized and took C. home.

"The next incident occurred in June 1980 and involved S.P., age 19. Olsen picked S.P. up while she was hitchhiking. He put his knife to her throat and cut her slightly, and also orally copulated her. Next, Olsen took S.P. to an isolated area in the mountains, where he tied her hands behind her back with a belt. S.P. screamed in pain when Olsen put his fingers in her anus and then sodomized her. He also made derogatory sexual statements during the course of the sodomy.

"The last incident occurred on July 9, 1980, about one month after the incident involving S.P. K. was a 17- year-old beauty college student who met Olsen when he used a pay phone after she used it during her lunch hour. Later that day, Olsen called K. over to his car when she came out of the beauty college. Olsen then pulled K. into his car by holding a knife to her throat. Olsen had pictures of K. in his car and threatened to kill her.

"After getting K. into his car, Olsen tied a rope painfully tight around her neck and gagged her with a cloth and shoestrings. Olsen then drove K. to an isolated area in the hills. On the way, Olsen undressed K. and fondled her. After arriving, Olsen tied K. to a log with ropes attached to her wrists, legs, and neck. He then hit K. in the buttocks with a stick, causing bruises, and sodomized and raped her. After finishing the assault, Olsen was pleasant and talkative with K. He also showed her how to shoot his BB gun. But when K. made the comment, 'well, everyone needs friends,' Olsen became very angry

9

and violent.  He pushed K. down, sodomized her again, bit her neck, and hit her on the buttocks with his BB gun, breaking it.

"Following the 1980 offenses, Olsen pleaded guilty to the sodomy and oral copulation of C. and the sodomy and rape of K.  He has been in custody since 1980." (*Olsen*, *supra*, H036654 at pp. 3-5.)

"On September 26, 2008, the People filed an amended petition to extend Olsen's commitment as a sexually violent predator under the SVPA.  The petition stated that on October 5, 2000, Olsen was committed as [an SVP] to the [Department] for two years, and since that date he 'has been consistently committed to a new term as [an SVP].' [Fn. omitted.]  The People asserted that Olsen 'continues to meet the criteria for commitment as [an SVP] in that he continues to have a current diagnosed mental disorder that makes him a danger to the health and safety of others in that it is likely that he will engage in sexually violent criminal behavior in the future.'

"After a probable cause hearing was held, the trial court issued its July 2, 2010 order finding that there was probable cause to believe that (1) Olsen had been convicted of a qualifying sexually violent offense against at least one victim; (2) he has a diagnosable mental disorder; (3) the disorder makes it likely that he will engage in sexually violent criminal conduct if released; and (4) the sexually violent criminal conduct will be predatory in nature.  Thereafter, the case proceeded to a jury trial." (*Olsen*, *supra*, H036654 at pp. 2-3.)

"On February 18, 2011, the jury rendered its verdict finding the petition alleging that Olsen was [an SVP] within the meaning of section 6600 to be true.  On February 22, 2011, the trial court issued its order committing Olsen to the custody of [the Department] for an indeterminate term for appropriate treatment and confinement in a secure facility, pursuant to section 6604.  The order further states that it is 'subject to a hearing consistent with [*McKee*, *supra*, 47 Cal.4th 1172].' " (*Olsen*, *supra*, H036654 at p. 7.)

In his prior appeal, defendant argued, among other things, that the "indeterminate commitment under the SVPA violates his constitutional right to equal protection" and "the SVPA violates his due process rights and the ex post facto and double jeopardy clauses and the Eighth and Fourteenth Amendments of the federal constitution." (*Olsen*, *supra*, H036654 at p. 2.) This court reversed the judgment and remanded the case to the trial court "for the limited purpose of reconsidering [defendant's] equal protection argument in light of [*McKee I*], and the resolution of the proceedings on remand in that case (*id.* at pp. 1208-1211)." (*Olsen*, *supra*, H036654 at pp. 24-25.) This court further ordered the trial court to "suspend further proceedings in this case pending finality of the proceedings on remand in *McKee*[ *I*]. 'Finality of the proceedings' shall include the finality of any subsequent appeal and any proceedings in the California Supreme Court." (*Id.* at p. 25.)

On January 25, 2013, after the California Supreme Court denied review of *McKee II*, the trial court ordered defendant committed to the Department for an indeterminate term under the SVPA.

## IV. DISCUSSION

### A. Challenges to the Application of McKee II

Defendant challenges the applicability of *McKee II* to his case. He claims he was entitled to his own evidentiary hearing to challenge the constitutionality of the SVPA's indeterminate commitment scheme.

First, defendant argues that *McKee II* is not binding authority and that the California Supreme Court's denial of review of *McKee II* should not be construed as the high court's approval of the *McKee II* decision. We acknowledge that the opinion of one court of appeal is not ordinarily binding on another court of appeal. (*McCallum v. McCallum* (1987) 190 Cal.App.3d 308, 315, fn. 4.) And while the Supreme Court's denial of a petition for review is not to be construed as the high court's having approved of the propositions set forth in the Court of Appeal's decision, " 'it does not follow that

11

such a denial is without significance as to [the high court's] views [citations].' [Citation.]" (*In re Retirement Cases* (2003) 110 Cal.App.4th 426, 449, fn. 13, quoting *DiGenova v. State Board of Education* (1962) 57 Cal.2d 167, 178.)  In this instance, the Supreme Court clearly implied that the decision in *McKee II,* if not binding, should at least be given considerable weight by other courts.  (See *People v. McKnight* (2012) 212 Cal.App.4th 860, 863-864 (*McKnight*).)  Absent a showing that the court erred in *McKee II*, we will consider it dispositive here.

Next, defendant argues that he is not similarly situated to McKee because, unlike McKee, he was not diagnosed as a pedophile.  He contends that he is entitled to his own evidentiary hearing because equal protection challenges to the SVPA must be resolved on an "as applied" basis, and he has a due process right to have "an opportunity to demonstrate a life commitment cannot validly be imposed on him."

These arguments were rejected in *McKnight, supra,* 212 Cal.App.4th at pp. 863-864 and in *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1377-1378 (*McDonald*).  In *McKnight*, the defendant argued that he was "differently situated from Mr. McKee because he was not convicted of crimes against children."  (*McKnight, supra,* 212 Cal.App.4th at p. 863.)  The appellate court disagreed because "the analysis and holding in *McKee II* do not turn on concerns specific to child predators."  (*Ibid.*)  The court observed that "*McKee I* recognized that the People could attempt to justify the [SVPA]'s disparate impact in a variety of ways, and that these included showing that SVP's as a class are significantly more likely to reoffend than MDO's or NGI's, showing they pose a greater risk to children (in which case the equal protection analysis would apply only to child predators), or by other, unspecified means. [Citation.]  In light of that recognition, the Court transferred the multiple 'grant and hold' cases under *McKee I . . .* to the Courts of Appeal with directions to vacate their prior opinions and suspend further proceedings until the *McKee I* remand proceedings were final, '*in order to avoid an unnecessary multiplicity of proceedings*.' [Citations.]  On remand, *McKee* [*II*] concluded

12

that differences between *SVP's as a class* and other offenders justify their different treatment under the [SVPA]." (*Ibid.*) The *McKnight* court concluded, that "*McKee II* is not to be restricted to Mr. McKee alone or only to those SVP's convicted of crimes against children . . . but rather its holding applies to the class of SVP's as a whole." (*Id.* at pp. 863-864.)

The *McDonald* court agreed with the *McKnight* holding and rejected the defendant's argument that he had a due process right to present his own evidence supporting an equal protection challenge to an indeterminate commitment. (*McDonald, supra*, 214 Cal.App.4th at pp. 1377-1378.) The court noted that *McKee I* expressed that "the People's burden on remand would be to prove that SVP's 'as a class'—and not McKee as an individual—'bear a substantially greater risk to society.' As an example of how the People might satisfy this burden, the court stated the People may demonstrate 'the inherent nature of the SVP's mental disorder makes recidivism *as a class* significantly more likely.' [Citation.] The Supreme Court's emphasis on classwide proof, together with its suspension of activity in grant-and-hold cases to avoid an unnecessary multiplicity of proceedings, demonstrates to us the Supreme Court intended the equal protection challenge to the Amended SVPA be resolved on a classwide basis in a single case." (*Id.* at p. 1378.)

We agree with *McKnight* and *McDonald*, and we conclude that the *McKee II* decision applied to the class of SVP's as a whole, including defendant in this case.

### B. Equal Protection

Defendant next argues that *McKee II* incorrectly applied the law regarding the equal protection challenge to indeterminate commitment, and thus, this court should not follow that case. Defendant contends that *McKee II* "applied the incorrect standard of review," "improperly applied the rational basis test, rather than strict scrutiny, to the factual questions before it," "improperly considered evidence not relevant to a

13

determination of the lawmakers' intent," and "failed to compare the SVP, MDO and NGI schemes to each other in light of the evidence adduced at the hearing."

First, defendant contends that the *McKee II* court improperly applied a substantial evidence standard of review, rather than an independent standard of review, to determine "whether the evidence presented justified the statutory distinctions drawn between SVP[']s, MDO[']s and NGI[']s."

In *McKee II*, the appellate court stated: "In independently reviewing the evidence admitted at the remand hearing, we must determine whether the People presented substantial evidence to support a reasonable inference or perception that the [SVPA]'s disparate treatment of SVP's is necessary to further compelling state interests. [Citations.]" (*McKee II, supra,* 207 Cal.App.4th at p. 1339.) Having reviewed the opinion, we believe the *McKee II* court's description of its review is consistent with an independent, de novo review of the evidence, as well as with the Supreme Court's opinion and directions in *McKee I*. After the *McKee I* court remanded the case, the *McKee II* court independently reviewed all of the evidence and concluded that "the disparate treatment of SVP's under the [SVPA] is reasonable and factually based and was adequately justified by the People at the evidentiary hearing on remand." (*Id.* at pp. 1339-1348.) We discern no error. Additionally, we note that other courts have rejected similar challenges to *McKee II*. (See *McKnight*, *supra*, 212 Cal.App.4th at p. 864 [finding that the "claim that the appellate court failed to independently review the trial court's determination is frivolous"]; *People v. Landau* (2013) 214 Cal.App.4th 1, 47-48; *McDonald*, *supra*, 214 Cal.App.4th at pp.1378, 1381.)

Second, we reject defendant's claim that the *McKee II* court applied a rational basis test rather than a strict scrutiny test in reviewing the evidence presented at the hearing. He criticizes *McKee II* for analyzing whether there was "substantial, factual evidence to support a reasonable perception" of the distinctions between MDO's, NGI's, and SVP's (*McKee II, supra,* 207 Cal.App.4th at p. 1338), claiming this language is more

14

akin to the rational basis test. He also claims that the court failed to evaluate whether the different treatment of MDO's, NGI's, and SVP's is " 'necessary' to promote a compelling state interest." He further contends that the court failed to explain why it is necessary (1) to impose a "lifetime commitment" rather than a shorter commitment of four or five years, (2) to shift the burden of proof unto SVP's for release, and (3) to withdraw the right to a jury.

The *McKee II* court clearly understood that the strict scrutiny test required the government to "show both a compelling state interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest. [Citations.]" (*McKee II, supra,* 207 Cal.App.4th at p. 1349.) Further, specific to the case before it, the *McKee II* court referred to the issue as "whether the People presented substantial evidence to support a reasonable inference or perception that the [SVPA]'s disparate treatment of SVP's is necessary to further compelling state interests. [Citations.]" (*Id.* at p. 1339.) The appellate court's use of the phrase "reasonable inference or perception" (*ibid.*) reflects the California Supreme Court's remand instructions in *McKee I.* In *McKee I,* the California Supreme Court stated, "[T]he government has not yet shown that the special treatment of SVP's is validly based on the degree of danger *reasonably perceived* as to that group, nor whether it arises from any medical or scientific evidence. On remand, the government will have an opportunity to justify Proposition 83's indefinite commitment provisions . . . and demonstrate that they are based on a reasonable perception of the unique dangers that SVP's pose rather than a special stigma that SVP's may bear in the eyes of California's electorate." (*McKee I, supra,* 47 Cal.4th at p. 1210, italics added, fn. omitted.) Therefore, in applying the strict scrutiny test, *McKee II* followed the language set forth in *McKee I.*

We also reject defendant's argument that *McKee II* failed to explain why the SVPA's imposition of greater burdens (i.e., a "lifetime commitment" rather than a shorter commitment time of four or five years, a burden shift, and the withdrawal of jury rights)

15

are necessary to further the government's compelling state interest. At trial in *McKee II*, the People presented evidence that (1) the vast majority of SVP's are diagnosed with pedophilia or other paraphilias, (2) a paraphilia ordinarily persists throughout a patient's lifetime, (3) medication does not decrease the deviant sexual interests of SVP's, (4) treatment is not focused on medication but on tools to limit the risk of reoffense, and (5) most SVP's do not participate in treatment. (See *McKee II*, *supra*, 207 Cal.App.4th at pp. 1344-1346.) In contrast, only a very small percentage of MDO's and NGI's suffer from pedophilia or other paraphilias, and those patients with severe mental illnesses are treated with psychotropic medications and then psychosocial therapy. (*Id.* at p. 1344.) Further, MDO's and NGI's are usually amenable to and comply with treatment. (*Id.* at p. 1345.) In fact, two-thirds of MDO's and NGI's comply with their treatment programs and are typically decertified after about three years. (*Ibid.*) Based on this contrasting evidence, we discern no defect in the court's conclusion that "the disparate treatment of SVP's under the [SVPA] is necessary to further the People's compelling interests of public safety and humane treatment of the mentally disordered." (*Id.* at p. 1331.)

Third, defendant contends that the *McKee II* court improperly considered irrelevant evidence: what the voters and Legislature might have considered, rather than what they actually considered in enacting Proposition 83 and the 2006 amendments to the SVPA. He contends that "rather than look to the actual motivation of the voters who enacted Proposition 83 or to the legislative history behind S.B. 1128, the San Diego Superior Court took evidence from a variety of experts and witnesses about the theoretical reasons that could support the use of indeterminate terms for SVP committees." Once again, we believe that the *McKee II* court's analysis stemmed from the instructions given to the trial court in *McKee I,* where the California Supreme Court specified that expert testimony could be considered in determining the relevant issues, such as whether "the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely." (*McKee I, supra,* 47 Cal.4th at p. 1208.)

16

Next, defendant argues that the *McKee II* court erred in refusing to require that "the SVPA amendments be narrowly tailored to serve their purported purpose." Defendant claims that "[g]overnment actions that burden the exercise of fundamental rights or liberty interests are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest."

In *McKee II,* McKee argued that the SVPA was unconstitutional unless it adopted the "least restrictive means available." (*McKee II, supra,* 207 Cal.App.4th at p. 1349.) McKee relied on *Bernal v. Fainter* (1984) 467 U.S. 216, 219 (*Bernal*), where the United States Supreme Court stated, "[i]n order to withstand strict scrutiny, the law must advance a compelling state interest by the least restrictive means available." The *McKee II* court described the quoted sentence from *Bernal* as "probable dictum," distinguishing *Bernal* because it involved a suspect class, alienage. (*McKee II, supra,* 207 Cal.App.4th at p. 1349.) "We are unaware of any case applying the 'least restrictive means available' requirement to all cases involving disparate treatment of similarly situated classes," the *McKee II* court wrote. (*Ibid.*) "On the contrary, our review of equal protection case law shows the two-part test, as discussed in *Moye*[, *supra,* 22 Cal.3d 457] and *McKee* [*I*], is the prevailing standard. . . . Therefore, in strict scrutiny cases, the government must show both a compelling state interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest. [Citations.] We are unpersuaded the electorate that passed Proposition 83 in 2006 was required to adopt the least restrictive means available (e.g., a two-year or other determinate term of civil commitment) in disparately treating SVP's and furthering the compelling state interests of public safety and humane treatment of the mentally disordered." (*McKee II, supra,* 207 Cal.App.4th at p. 1349.)

We agree with the *McKee II* court's analysis of this issue. In remanding the case in *McKee I*, the California Supreme Court instructed the trial court to "apply[] the equal protection principles articulated in *Moye* and related cases discussed in the [*McKee I*]

17

opinion" (*McKee I*, *supra*, 47 Cal.4th at p. 1208), and to determine whether, after a trial, the People had shown that imposing on SVP's greater burdens to obtain release from commitment is necessary to promote the state's compelling interests in public safety and humane treatment of the mentally ill (*id.* at pp. 1207-1211). As discussed, the evidence the People presented in *McKee II* – that the vast majority of SVP's are diagnosed with pedophilia or other paraphilias, that a paraphilia ordinarily persists throughout a patient's lifetime, that treatment is not focused on medication, and that most SVP's do not participate in treatment (*McKee II, supra,* 207 Cal.App.4th at pp. 1344-1345) – supported the conclusion that an indeterminate term is necessary to further the compelling state interest in providing treatment to SVP's and protecting the public. We thus have no basis in holding otherwise or determining that that there is any less burdensome or narrowly tailored alternative to effectuate those interests.

Finally, defendant contends that the *McKee II* court failed to address or distinguish *In re Calhoun* (2004) 121 Cal.App.4th 1315 (*Calhoun*) to the extent it held that differences between MDO's and SVP's did not justify different schemes for forcible administration of medication. However, the equal protection issue in *McKee II* turned on the differences in SVP's and MDO's recidivism rates, dangerousness, and diagnosis and treatment. (*McKee II, supra,* 207 Cal.App.4th at pp. 1340-1347.) The equal protection issue in *Calhoun*, in contrast, turned on whether there were any differences between SVP's and MDO's regarding the need for and effectiveness of antipsychotic medication. The decision in *Calhoun* thus has little relevance to the issues presented in *McKee II*. (See *McKee I, supra,* 47 Cal.4th at p. 1220, fn. 4 (conc. & dis. opn. of Chin, J.) [noting that *Calhoun* "hardly applies here" because the "exact criteria for medicating mentally disordered offenders is an entirely different matter from the procedures adopted for releasing them into society"].)

In light of the Supreme Court's clearly expressed intent to avoid an unnecessary multiplicity of proceedings, its denial of review in *McKee II,* and our conclusions

18

regarding the asserted flaws in *McKee II,* we find that defendant's equal protection claims are without merit and do not require a remand for a further evidentiary hearing.

## V.  DISPOSITION

The judgment is affirmed.


_____
BAMATTRE-MANOUKIAN, ACTING P.J.


WE CONCUR:


_____
MÁRQUEZ, J.


_____
GROVER, J.